UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Antitrust Division<br>450 Fifth Street, N.W., Suite 4000<br>Washington, DC  20530,<br><br>and<br><br>STATE OF CONNECTICUT<br>Office of the Attorney General<br>55 Elm Street<br>Hartford, CT  06106,<br><br>          *Plaintiffs*,<br><br>    v.<br><br>AMC ENTERTAINMENT HOLDINGS, INC.<br>One AMC Way<br>11500 Ash Street<br>Leawood, KS  64105,<br><br>and<br><br>SMH THEATRES, INC.<br>12750 Merit Drive, Suite 800<br>Dallas, TX  75251,<br><br>          *Defendants*. | Civil Action No.:<br><br>Judge:<br><br>Filed: |

# COMPLAINT

The United States of America, acting under the direction of the Attorney General of the United States, and the State of Connecticut, acting by and through its Office of the Attorney General, bring this civil antitrust action to prevent the proposed acquisition by AMC

Entertainment Holdings, Inc. ("AMC") of all of the outstanding voting securities of SMH Theatres, Inc. ("Starplex Cinemas").

## I.     NATURE OF ACTION

1. AMC is a significant competitor to Starplex Cinemas in the exhibition of first-run, commercial movies in the area in and around East Windsor, New Jersey and in the area in and around Berlin, Connecticut.  If AMC's acquisition of Starplex Cinemas is permitted to proceed, it would give AMC direct control of its most significant competitor in these markets.  The acquisition likely would substantially lessen competition in the exhibition of first-run, commercial movies in each of these markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## II.     JURISDICTION AND VENUE

2. This action is filed by the United States pursuant to Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to obtain equitable relief and to prevent a violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.

3. The State of Connecticut brings this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent the defendants from violating Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18.  The State of Connecticut, by and through its Office of the Attorney General, brings this action as *parens patriae* on behalf of the citizens, general welfare, and economy of its state.

4. The distribution and theatrical exhibition of first-run, commercial films is a commercial activity that substantially affects, and is in the flow of, interstate trade and commerce.  Defendants' activities in purchasing equipment, services, and supplies as well as licensing films for exhibition substantially affect interstate commerce.  The Court has jurisdiction over the

subject matter of this action pursuant to 15 U.S.C. § 25 and 28 U.S.C. §§ 1331, 1337(a), and 1345.

5. Defendants consent to personal jurisdiction and venue in this district. Therefore, this Court has personal jurisdiction over each Defendant and venue is proper under 28 U.S.C. § 1391(b) and (c). In addition, venue is proper under 15 U.S.C. § 22 because one defendant operates theatres in this District; the other transacts business by attracting patrons from and advertising in this District.

### III.    DEFENDANTS AND THE PROPOSED ACQUISITION

6. Defendant AMC is a Delaware corporation with its headquarters in Leawood, Kansas. AMC operates 349 theatres and 4,975 screens in locations throughout the United States. Measured by number of screens and box office revenue, AMC is the second-largest theatre circuit in the United States.

7. Defendant Starplex Cinemas is a Texas corporation with its headquarters in Dallas, Texas. Starplex operates 33 movie theatres with a total of 346 screens in the United States, primarily located in small to midsize markets.

8. On July 13, 2015, AMC and Starplex Cinemas executed a stock purchase agreement. Under the agreement, AMC will acquire all outstanding voting securities of Starplex Cinemas for approximately $172 million.

### IV.    BACKGROUND OF THE MOVIE THEATRE INDUSTRY

9. Viewing movies in the theatre is a popular pastime. Over one billion movie tickets were sold in the United States in 2014, with total box office revenue reaching approximately $10 billion.

10.     Companies that operate movie theatres are called "exhibitors." Some exhibitors own a single theatre, whereas others own a circuit of theatres within one or more regions of the United States. AMC and Starplex Cinemas are exhibitors in the United States.

11.     Exhibitors set ticket prices for a theatre based on a number of factors, including the age and condition of the theatre, the number and type of amenities the theatre offers (such as the range of snacks, food and beverages offered, the size of its screens and quality of its sound systems, and whether it provides stadium and/or reserved seating), competitive pressures facing the theatre (such as the price of tickets at nearby theatres, the age and condition of those theatres, and the number and type of amenities they offer), and the population demographics and density surrounding the theatre.

## V.     RELEVANT MARKET

### A. Product Market

12.     Movies are a unique form of entertainment. The experience of viewing a movie in a theatre is an inherently different experience from live entertainment (e.g., a stage production or attending a sporting event) or viewing a movie in the home (e.g., through streaming video, on a DVD, or via pay-per-view).

13.     Reflecting the significant differences of viewing a movie in a theatre, ticket prices for movies generally differ from prices for other forms of entertainment. For example, live entertainment is typically significantly more expensive than a movie ticket, whereas home viewing through streaming video, a DVD rental, or pay-per-view is usually significantly less expensive than viewing a movie in a theatre.

14.     Viewing a movie at home typically lacks several characteristics of viewing a movie in a theatre, including the size of the screen, the sophistication of the sound system, and the

social experience of viewing a movie with other patrons. In addition, the most popular newly released or "first-run" movies are not available for home viewing at the time they come out in theatres.

15. Movies are considered to be in their "first-run" during the four to five weeks following initial release in a given locality. If successful, a movie may be exhibited at other theatres after the first-run as part of a second or subsequent run (often called a "sub-run" or "second-run"). Moviegoers generally do not regard sub-run movies as an adequate substitute for first-run movies. Reflecting the significant difference between viewing a newly released, first-run movie and an older sub-run movie, tickets at theatres exhibiting first-run movies usually cost significantly more than tickets at sub-run theatres.

16. Art movies and foreign-language movies are also not reasonable substitutes for commercial, first-run movies. Art movies, which include documentaries, are sometimes referred to as independent films. Although art and foreign-language movies appeal to some viewers of commercial movies, art and foreign-language movies tend to have more narrow appeal and typically attract an older audience than commercial movies. Exhibitors consider the operation of theatres that exhibit art and foreign-language movies to be distinct from the operation of theatres that exhibit commercial movies.

17. The relevant product market within which to assess the competitive effects of this acquisition is the exhibition of first-run, commercial movies. A hypothetical monopolist controlling the exhibition of all first-run, commercial movies would profitably impose at least a small but significant and non-transitory increase in ticket prices.

*B. Geographic Markets*

18. Moviegoers typically are not willing to travel very far from their home to attend a movie. As a result, geographic markets for the exhibition of first-run, commercial movies are relatively local.

<u>Area In and Around East Windsor, New Jersey</u>

19. AMC and Starplex Cinemas account for the majority of the first-run, commercial movie tickets sold in and around East Windsor, New Jersey ("East Windsor"). The only theatres that predominantly show first-run commercial movies in the East Windsor area are the Starplex Town Center Plaza 10, the AMC MarketFair 10, and the AMC Hamilton 24. The Starplex theatre is located approximately 10 miles from each of the AMC theatres.

20. Moviegoers who reside in East Windsor are unlikely to travel significant distances out of that area to attend a first-run, commercial movie. A small but significant increase in the price of tickets by a hypothetical monopolist of first-run, commercial movie theatres in East Windsor would likely not cause a sufficient number of moviegoers to travel out of that area to make the increase unprofitable. East Windsor constitutes a relevant geographic market in which to assess the competitive effects of this acquisition.

<u>Area In and Around Berlin, Connecticut</u>

21. AMC and Starplex Cinemas account for the majority of the first-run, commercial movie tickets sold in and around Berlin, Connecticut ("Berlin"). Within the Berlin area are the Starplex Berlin 12 and the AMC Plainville 20. These two theatres are located approximately 8 miles apart. Only three other theatres in the Berlin area also show first-run, commercial movies.

22. Moviegoers who reside in Berlin are unlikely to travel significant distances out of that area to attend a first-run, commercial movie. A small but significant increase in the price of

6

tickets by a hypothetical monopolist of first-run, commercial movie theatres in Berlin would likely not cause a sufficient number of moviegoers to travel out of that area to make the increase unprofitable. Berlin constitutes a relevant geographic market in which to assess the competitive effects of this acquisition.

## VI. COMPETITIVE EFFECTS

23. Exhibitors compete to attract moviegoers to their theatres over the theatres of their rivals. They do that by competing on price, knowing that if they charge too much (or do not offer sufficient discounted tickets for matinees, seniors, students, or children) moviegoers will begin to frequent their rivals. Exhibitors also compete by seeking to license the first-run movies that are likely to attract the largest numbers of moviegoers. In addition, they compete over the quality of the viewing experience by offering moviegoers the most sophisticated sound systems, largest screens, best picture clarity, best seating (including stadium and reserved seating), and the broadest variety and highest quality snacks, food, and drinks at concession stands or cafés in the lobby or served to moviegoers at their seats.

24. AMC and Starplex Cinemas currently compete for moviegoers in the East Windsor and Berlin markets. These markets are concentrated, and in each market, AMC and Starplex Cinemas are the other's most significant competitor, given their close proximity. Their rivalry spurs each to improve the quality of its theatres and keeps ticket prices in check. Theatres operated by other exhibitors offer less attractive options for visitors to defendants' theatres because those theatres are located farther away or are smaller in size or poorer in quality.

25. In the relevant markets at issue, the acquisition of Starplex Cinemas likely will result in a substantial lessening of competition. In the East Windsor and Berlin markets, the

transaction will lead to significant increases in concentration and eliminate existing competition between AMC and Starplex Cinemas.

26. Market concentration is often a useful indicator of the level of competitive vigor in a market and the likely competitive effects of a merger. The more concentrated a market, and the more a transaction would increase that concentration, the more likely it is that the transaction would result in reduced competition, harming consumers. Market concentration commonly is measured by the Herfindahl-Hirschman Index ("HHI"), as discussed in Appendix A. Markets in which the HHI exceeds 2,500 points are considered highly concentrated, and transactions that increase the HHI by more than 200 points in highly concentrated markets are presumed likely to enhance market power.

27. In East Windsor, the proposed acquisition would give AMC control of all of the first-run, commercial movie theatres, with 34 out of 34 total screens and a 100% share of the $13 million annual box office revenues. The acquisition would yield a post-acquisition HHI of 10,000, representing an increase of roughly 2,300 points.

28. In Berlin, the proposed acquisition would give AMC control of three of the six first-run, commercial movie theatres, with 44 out of 79 total screens and an approximate 68% share of the $11 million annual box office revenues. The acquisition would yield a post-acquisition HHI of approximately 5,260, representing an increase of roughly 2,280 points.

29. Today, were one of defendants' theatres to unilaterally increase ticket prices in East Windsor or Berlin, the exhibitor that increased price would likely suffer financially as a substantial number of its customers would patronize the other exhibitor. The acquisition would eliminate this pricing constraint. Thus, the acquisition is likely to lead to higher ticket prices for

moviegoers, which could take the form of a higher adult evening ticket price or reduced discounting for matinees, children, seniors, or students.

30.     The proposed acquisition likely would also reduce competition between AMC and Starplex Cinemas over the quality of the viewing experience at their East Windsor or Berlin theatres.  If no longer motivated to compete, AMC and Starplex Cinemas would have reduced incentives to maintain, upgrade, and renovate their theatres, to improve the theatres' amenities and services, or to license the most popular movies, thus reducing the quality of the viewing experience for moviegoers in East Windsor and Berlin.

## VII.     ENTRY

31.     Sufficient, timely entry that would deter or counteract the anticompetitive effects alleged above is unlikely.  Exhibitors are reluctant to locate new first-run, commercial theatres near existing first-run, commercial theatres unless the population density, demographics, or the quality of existing theatres makes new entry viable.  Over the next two years, entry of new first-run, commercial movie theatres in East Windsor or Berlin would be unlikely to defeat a price increase by the merged firm.

## VIII.     VIOLATION ALLEGED

32.     Plaintiffs hereby reincorporate paragraphs 1 through 28.

33.     The likely effect of the proposed transaction would be to substantially lessen competition in the relevant product and geographic markets in violation of Section 7 of the Clayton Act, 15 U.S.C. §18.

34.     The transaction would likely have the following effects, among others:  (a) the prices of tickets at first-run, commercial movie theatres in East Windsor and Berlin would likely increase to levels above those that would prevail absent the acquisition; and (b) the quality of

first-run, commercial theatres and the viewing experience at those theatres would likely decrease below levels that would prevail absent the acquisition.

## IX. REQUESTED RELIEF

35. Plaintiffs request: (a) adjudication that the proposed acquisition would violate Section 7 of the Clayton Act; (b) permanent injunctive relief to prevent the consummation of the proposed acquisition; (c) an award to each Plaintiff of its costs in this action; and (d) such other relief as is proper.

DATED: DECEMBER 15, 2015

**FOR PLAINTIFF UNITED STATES OF AMERICA**

*/s/ William J. Baer*
William J. Baer (D.C. Bar #324723)
Assistant Attorney General for Antitrust

*/s/ Renata B. Hesse*
Renata B. Hesse (D.C. Bar #466107)
Deputy Assistant Attorney General

*/s/ Patricia A. Brink*
Patricia A. Brink
Director of Civil Enforcement

*/s/ David C. Kully*
David C. Kully (D.C. Bar #448763)
Chief, Litigation III

*/s/ Ethan C. Glass*
Ethan C. Glass (D.D.C. Bar #MI0018)
Assistant Chief, Litigation III

*/s/ Lisa A. Scanlon*
Lisa A. Scanlon
Assistant Chief, Litigation III

*/s/ Gregg Malawer*
Gregg I. Malawer (D.C. Bar #481685)
Miriam R. Vishio (D.C. Bar #482282)
Trial Attorneys, Litigation III

U.S. Department of Justice
Antitrust Division
450 5th Street, NW, Suite 4000
Washington, DC 20530
Fax: (202) 514-7308
Telephone: Gregg Malawer (202) 616-5943
E-mail: gregg.malawer@usdoj.gov
Telephone: Miriam Vishio (202) 598-8091
E-mail: miriam.vishio@usdoj.gov

DATED: DECEMBER 15, 2015

**FOR PLAINTIFF
STATE OF CONNECTICUT**

_____
GEORGE JEPSEN
*ATTORNEY GENERAL*
By: Michael E. Cole
Assistant Attorney General
Chief, Antitrust & Government Program Fraud
55 Elm Street, P.O. Box 120
Hartford, CT 06141-120
860-808-5040
Email: Michael.cole@ct.gov

## APPENDIX A

### *Herfindahl-Hirschman Index*

The term "HHI" means the Herfindahl-Hirschman Index, a commonly accepted measure of market concentration. The HHI is calculated by squaring the market share of each firm competing in the relevant market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2 = 2,600$). The HHI takes into account the relative size distribution of the firms in a market. It approaches zero when a market is occupied by a large number of firms of relatively equal size, and reaches its maximum of 10,000 points when a market is controlled by a single firm. The HHI increases both as the number of firms in the market decreases and as the disparity in size between those firms increases.

Markets in which the HHI is between 1,500 and 2,500 points are considered to be moderately concentrated, and markets in which the HHI is in excess of 2,500 points are considered to be highly concentrated. *See* U.S. Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines* § 5.3 (2010) ("Guidelines"). Transactions that increase the HHI by more than 200 points in highly concentrated markets presumptively raise antitrust concerns under the Guidelines. *Id.*